# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

CORNELE A. OVERSTREET, Regional
Director of the Twenty-Eighth Region of
the National Labor Relations Board, for
and on behalf of the National Labor
Relations Board,

                Plaintiff,

v.

APEX LINEN SERVICE INC.,

                Defendant.

Case No. 2:17-cv-02923-APG-CWH

**ORDER GRANTING IN PART
PETITION FOR TEMPORARY
INJUNCTION**

(ECF No. 1)

      Petitioner Cornele Overstreet, Regional Director for the National Labor Relations Board (NLRB or Board), filed a petition for a temporary injunction against respondent Apex Linen Service, Inc. under § 10(j) of the National Labor Relations Act (NLRA). ECF No. 1. Apex operates a laundry business in Las Vegas providing service for commercial entities like hotels and restaurants. ECF Nos. 1-2 at 2; 29-1 at 30-31. It employs engineers to maintain equipment. ECF Nos. 1-2 at 2; 29-1 at 34. On January 24, 2017, the International Union of Operating Engineers Local 501, AFL-CIO petitioned for a vote to become the exclusive bargaining representative for the engineers. ECF No. 1-1 at 139. The vote was held on February 6, and the engineers voted in favor of the union by a vote of 10 to 4. *Id.* at 56, 104, 143; ECF No. 1-2 at 10. This was the first time a union represented employees at Apex. ECF No. 29-1 at 41. The dispute in this case concerns events leading up to and following the vote.

      Starting in February 2017 and through July 2017, the union filed numerous charges with the NLRB alleging Apex had engaged in unfair labor practices. The NLRB consolidated those charges into a complaint against Apex. Apex filed an answer, and that matter is proceeding before an administrative law judge (ALJ), who will make recommendations to the Board.

/ / / /

In the meantime, NLRB Regional Director Overstreet petitions for this court to enter a temporary injunction under § 10(j) of the NLRA against Apex arising out of Apex's alleged unfair labor practices.  Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  In determining whether temporary relief is just and proper under the circumstances, I "consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (quotation omitted).  Those criteria are: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, under the sliding scale approach, the party seeking injunctive relief must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the moving party's favor, and (4) an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In applying these criteria, I am cognizant that the availability of injunctive relief in this context is designed "to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge." *Avanti Health Sys., LLC*, 661 F.3d at 1187 (quotation omitted).  The remedy is meant to prevent someone from accomplishing an unlawful objective based on the delay between the unfair labor practice and final resolution of the complaint process. *See Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 n.3 (9th Cir. 1994) (en banc).

The fact that the NLRB exercised its discretion to seek a § 10(j) injunction does not mean I must defer to the Board in deciding whether interim relief is appropriate. *Small v. Operative*

1    *Plasterers' & Cement Masons' Int'l Ass'n Local 200, AFL-CIO*, 611 F.3d 483, 490 (9th Cir.

2    2010).  However, I "should evaluate the probabilities of the complaining party prevailing in light

3    of the fact that ultimately, the Board's determination on the merits will be given considerable

4    deference." *Id.* (quotation omitted).

5    **I.  Likelihood of Success on the Merits**

6          To show a likelihood of success on the merits in a § 10(j) proceeding, the Regional

7    Director must show a "probability that the Board will issue an order determining that the unfair

8    labor practices alleged by the Regional Director occurred and that this Court would grant a

9    petition enforcing that order, if such enforcement were sought." *Frankl ex rel. N.L.R.B. v. HTH*

10   *Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (quotation omitted).  The Regional Director meets

11   this burden by making a "threshold showing of likelihood of success by producing some evidence

12   to support the unfair labor practice charge, together with an arguable legal theory." *Avanti Health*

13   *Sys., LLC*, 661 F.3d at 1187 (quotation omitted).  "Conflicting evidence in the record does not

14   preclude the Regional Director from making the requisite showing for a section 10(j) injunction."

15   *HTH Corp.*, 693 F.3d at 1063 (quotation omitted).

16         Where, as here,[1] the Regional Director "seeks and receives approval from the NLRB

17   before filing a § 10(j) petition, the Director is owed special deference because likelihood of

18   success is a function of the probability that the Board will issue an order determining that the

19   unfair labor practices alleged by the Regional Director occurred." *Avanti Health Sys., LLC*, 661

20   F.3d at 1187 (quotation omitted).  "That the NLRB itself decid[ed] to file a Section 10(j) petition

21   might signal its future decision on the merits, assuming the facts alleged in the petition withstand

22   examination at trial." *Id.* (quotation omitted).

23         **A.  Section 8(a)(1)**

24         Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer to

25   "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section

26   157 of this title." 29 U.S.C. § 158(a)(1).  Section 157 gives employees "the right to self-

27

28         [1] The Board approved the § 10(j) petition on October 27, 2017. ECF No. 9 at 4.

organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." *Id.* § 157.

Overstreet asserts that Apex violated this section through three sets of acts: (1) Apex chief engineer Eugene Sharron interrogated employees about their support for the union, stated he would call employees to discover whether they supported the union, informed employees Apex suspected certain employees supported the union, and told employees the union would not do anything for them except take their money; (2) Apex chief executive officer and part owner Joseph Dramise told employees their wages would be reduced and schedules would no longer be honored if the union came in; and (3) Apex chief operating officer and part owner Marty Martin (Marty)[2] denied engineer Adam Arellano (who participated in bringing the union into Apex) his right to a union representative during an interview that Arellano reasonably believed might result in discipline.

*1. Sharron's Statements and Questioning of Employees*

After Apex learned of the union organizing effort, Marty sent Sharron to find out if there was genuine interest amongst the engineers in voting for the union. ECF No. 29-1 at 219-20. On January 24, 2017, Sharron, who is responsible for supervising the engineers, spoke to Apex engineer Joseph Servin. *Id.* at 53, 367-68, 530-31. According to Servin, Sharron asked him if he knew anything about the union forcing its way into Apex. ECF Nos. 1-1 at 142; 29-1 at 530-31. Fearing retaliation and possible termination before the union election, Servin stated he did not know anything about it. ECF Nos. 1-1 at 142; 29-1 at 531-32. According to Servin, Sharron told him that if the union came in, it would do nothing for him except take his money. ECF Nos. 1-1 at 142; 29-1 at 532. Sharron asked Servin if he knew how he would be voting and Servin (inaccurately) said he did not know because it was all news to him. ECF Nos. 1-1 at 142; 29-1 at 530-32.

---

[2] By coincidence, Apex's chief operating officer and the union's representative, Charles "Ed" Martin, share the same last name. I therefore refer to Marty Martin as Marty, and Ed Martin as Ed.

The next day, Sharron approached Arellano and asked if the engineers wanted a union. ECF Nos. 1-1 at 149-50; 29-1 at 493.  Arellano replied that he came from a union company, but he did not say anything else. ECF Nos. 1-1 at 150; 29-1 at 493.  Sharron responded that he came from a union company too but that he did not want the union, that the union was trying to force its way in, and that he was going to call everyone to see if they wanted the union to represent them. ECF Nos. 1-1 at 150; 29-1 at 493.  Sharron denies that he told Arellano or Servin that he was going to call the other engineers, but Sharron did call the other engineers, who all stated they were going to vote no. ECF No. 29-1 at 368-70.  Sharron reported this information back to Marty. *Id.* at 370.

According to Servin, between February 1st and 6th, Sharron approached him and stated "they" suspected Arellano, Charles Walker, and another employee named Rico were the three main people behind the union organizing effort. ECF No. 1-1 at 143.  Sharron testified at the ALJ proceedings that he suspected Arellano was behind the union organizing effort and that Arellano told him before the election that Arellano supported the union. ECF No. 29-1 at 371.  Although all of the engineers told Sharron they were voting no, the engineers voted in favor of the union.

Overstreet has shown a likelihood of success on these charges.  Marty sent Sharron to investigate the union organizing effort, and Sharron later stated "they" knew who was behind it.  The NLRB "has long held that, when, in comments to its employees, an employer specifically names other employees as having started a union movement or as being among the union leaders, the employer unlawfully creates the impression, in the minds of its employees, that he has been engaged in surveillance of his employees' union activities." *In Re Royal Manor Convalescent Hosp., Inc.*, 322 NLRB 354, 362 (1996).

Additionally, Overstreet has shown a likelihood of success related to Sharron's questioning of Servin and Arellano.  An employer has a First Amendment right to ask questions of and communicate with its employees about union matters "so long as the communications do not contain a threat of reprisal or force or promise of benefit." *Westwood Health Care Ctr.*, 330 NLRB 935, 947 (2000); *see also* 29 U.S.C. § 158(c) (providing that "[t]he expressing of any

views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit"). To determine the line between legitimate communications and unlawful coercion, the NLRB asks "whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Westwood Health Care Ctr.*, 330 NLRB at 948. Some factors that may be considered include (1) the background of hostility toward the union (or lack thereof); (2) the nature of the information sought; (3) the questioner's identity; (4) the place, tone, duration, purpose, and method of questioning, and (5) whether the questioning is repeated. *Id.* These are not the only factors to consider and the ultimate question is "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Id.*

There is no evidence that anyone at Apex expressed hostility toward the union before Sharron made his statements. However, Sharron's statements themselves appear hostile because he characterized it as the union "forcing" its way in, told Servin the union would do nothing but take his money, and told Arellano he did want the union and was going to call other employees to see where they stood. Within a day of the union's petition, Sharron had questioned two different engineers and indicated he was going to question all of them about their union views. Sharron was a supervisory engineer and was sent by Marty to investigate the union organizing effort. It is unclear from the record what Sharron's tone was, but apparently both Servin and Arellano felt intimidated enough to be circumspect in response to Sharron's questions. Indeed, all of the engineers denied they were going to vote for the union, even though a majority of them later did. Overstreet thus has presented some evidence of coercive questioning.

Additionally, Overstreet presented evidence that Sharron commented that the union would do nothing but take Servin's money. The NLRB has held that "comments designed to impress on the employees the futility of having selected the Union as their collective-bargaining representative" violate § 8(a)(1). *See Flamingo Hilton-Reno, Inc.*, 321 NLRB 409, 416 (1996).

/ / / /

1 Consequently, Overstreet has shown a likelihood of success on these allegations by presenting

2 some evidence and arguable legal theories.

3 *2. Dramise's Statements to Servin and Arellano*

4 About a week after Sharron spoke to Arellano and Servin about how they were going to

5 vote, Sharron approached Servin and said that Dramise wanted to talk to Servin and Arellano.

6 ECF No. 1-1 at 142; ECF No. 29-1 at 372 (Sharron testifying that Dramise requested the

7 meeting). Dramise, Sharron, Servin, and Arellano met in the conference room. According to

8 Servin, Dramise stated that if the union came in, he would no longer be able to honor contracts he

9 had with the employees, including shifts, days off, and benefits. ECF Nos. 1-1 at 142, 150; 29-1

10 at 496-97. Servin and Arellano were both hired on the condition that they had day shifts and

11 weekends off. ECF No. 1-1 at 142-43. Sharron testified at the ALJ proceeding that Dramise told

12 Arellano and Servin that if the union came in, there would be a new contract and Arellano and

13 Servin's contracts would be null and void. ECF No. 29-1 at 373. This was the first time Arellano

14 had ever met with Dramise even though he had been employed by Apex since 2011. ECF No. 29-

15 1 at 496-97, 515.

16 Overstreet has shown a likelihood of success on this allegation. Three different witnesses

17 testified that Dramise stated that if the union came in, he would no longer be able to honor

18 contracts he had with the employees, including shifts, days off, and benefits. That suggested to

19 Servin and Arellano that they would lose benefits if they voted for the union. Threatening loss of

20 benefits if employees vote for the union interferes with their rights to proceed collectively. *See*

21 *Longview Fibre Paper & Packaging, Inc.*, 356 NLRB 796, 803 (2011). Overstreet thus has

22 presented some evidence and an arguable legal theory for this allegation.

23 *3. Arellano's Request for Union Representation*

24 On February 13th, Marty called Arellano into a conference room. ECF No. 1-1 at 159.

25 Arellano sought to invoke his right to be represented by a union member during the meeting, but

26 Marty responded that this right did not apply because Apex had already made its decision, and

27 Arellano was terminated. *Id.* at 117, 159. Marty asked Arellano if he wanted to make a written

28

1  statement, but Arellano refused without a union representative present. *Id.* at 117-18, 159.

2  Arellano was then escorted off the property. *Id.* at 159-60.

3  Under *N.L.R.B. v. J. Weingarten, Inc.*, employees have the right under § 157 to have a

4  union representative at any interview the employee reasonably fears might result in disciplinary

5  action. 420 U.S. 251, 261 (1975). "[A]n employee has no Section 7 right to the presence of his

6  union representative at a meeting with his employer held solely for the purpose of informing the

7  employee of, and acting upon, a previously made disciplinary decision." *Baton Rouge Water*

8  *Works Co.*, 246 N.L.R.B. 995, 997 (1979). But this exception itself has an exception:

9  > if the employer engages in any conduct beyond merely informing the employee of
> a previously made disciplinary decision, the full panoply of protections accorded

10 > the employee under *Weingarten* may be applicable. Thus, for example, were the
> employer to inform the employee of a disciplinary action and then seek facts or

11 > evidence in support of that action . . ., such conduct would remove the meeting
> from the narrow holding of the instant case, and the employee's right to union

12 > representation would attach.

13 *Id.*

14 Arellano invoked his *Weingarten* rights and was denied. Although Marty testified that he

15 had already decided to terminate Arellano, Marty also asked Arellano if he wanted to make a

16 written statement. Overstreet thus has presented some evidence and an arguable legal theory that

17 the meeting went beyond merely informing Arellano of his termination, but instead sought to

18 obtain a written statement from him. *See El Paso Healthcare Sys., Ltd. d/b/a Las Palmas Med.*

19 *Ctr. & Nat'l Nurses Org. Comm. - Texas/NNU*, 28-CA-23368, 2011 WL 4527336 (N.L.R.B.

20 Sept. 29, 2011) ("[T]he Board has held that where an employer informs an employee of a

21 disciplinary action and then questions the employee to seek information to bolster that decision,

22 the employee's right to representation applies.").

23 **B. Section 8(a)(3)**

24 Section 8(a)(3) provides that it is an unfair labor practice for an employer "by

25 discrimination in regard to . . . tenure of employment . . . to encourage or discourage membership

26 in any labor organization." 28 U.S.C. § 158(a)(3). "An employer violates Section 8(a)(3) when

27 the employee's involvement in a protected activity was a substantial or motivating factor in the

28

employer's decision to discipline or terminate the employee." *HTH Corp.*, 693 F.3d at 1062. The Regional Director bears the initial burden of "showing that the employee was engaged in protected activity, the employer knew of such activity, and the employer harbored anti-union animus." *Id.* If he does so, then "the burden shifts to the employer to demonstrate that it would have taken the same action regardless of the employee's union activity." *Id.* "An employer cannot prove this affirmative defense where its asserted reasons for a discharge are found to be pretextual." *United Nurses Ass'ns of Cal. v. Nat'l Labor Relations Bd.*, 871 F.3d 767, 779 (9th Cir. 2017) (quotation omitted).

### 1. Arellano

Overstreet has met his burden of showing a likelihood of success on the claim that Apex fired Arellano in retaliation for his union activities. Arellano was behind the initial unionization effort. Sharron stated that Arellano was suspected to be a main person behind it and that before the election, Arellano told Sharron that he supported the union. Additionally, Arellano wore a union button on the day of the election. ECF No. 29-1 at 504. Arellano thus engaged in protected conduct and Apex was aware of that conduct. There is some evidence that Apex harbored anti-union animus, as discussed above with respect to the statements made by Sharron and Dramise.

Apex contends it had a legitimate reason to fire Arellano because he encouraged another employee to make a false worker's compensation claim. Overstreet has presented some evidence that this reason is pretextual. Prior to the incident at issue, Marty considered Arellano a good and talented employee. *Id.* at 46. Arellano was fired despite having no history of discipline and without Marty interviewing either the complaining witness, Victoria Hernandez, or Arellano. ECF No. 1-1 at 106, 108-11. Instead, Marty took the word of Hernandez's supervisor, Cristina Linares, who relayed Hernandez's allegations to Marty. *Id.* at 107-08. Marty testified he did not speak to Hernandez because she speaks only Spanish. ECF No. 29-1 at 62. But he could have interviewed Hernandez through an interpreter.

A reasonable fact finder could question why the employer would not talk to the only two employees involved in the conversation before deciding to terminate an employee who otherwise

had no disciplinary issues.  Upon questioning at the ALJ proceedings, Hernandez testified that her eye was not red before she came to work, it became irritated two or three hours after she started work, and once she informed Arellano that she did not think her eye injury occurred at work, the conversation ended. ECF No. 29-1 at 595-96, 605.  Arellano denies that he encouraged Hernandez to commit fraud. ECF No. 1-1 at 158.  Thus, had Marty interviewed the employees, he would have learned that Arellano did not continue to encourage Hernandez to make a worker's compensation claim even after learning that she did not believe the injury occurred at work.

Additionally, there is some evidence of shifting reasons for the firing.  Arellano was accused of sabotaging equipment and his termination record states he was fired for "insubordination, dishonesty, [and] willful or careless destruction of company assets." ECF No. 1-2 at 16.  Marty testified at the ALJ proceeding that Arellano was not involved in damaging company equipment, that those allegations had nothing to do with his termination, and that the basis for the discharge was for allegedly encouraging the false worker's compensation claim. ECF No. 1-1 at 108, 112-14.  Finally, the proximity in time between the union vote on February 6 and Arellano's firing on February 13 supports a retaliatory motive.  Overstreet thus has presented some evidence and an arguable legal theory for this charge.

### 2. Charles Walker

Walker was one of three individuals Sharron identified as being behind the union organizing effort. *Id.* at 143.  Walker volunteered to observe the union election. ECF No. 1-2 at 3. On February 10, Marty told Ed Martin, the union bargaining representative, that Apex was contemplating a layoff because, among things,[3] it no longer needed a graveyard shift. ECF No. 29-3 at 1.  Marty identified potentially affected engineers as Walker, Jaime Valdovimos Magana, and Leonardo Porter. *Id.* at 1-2.  On February 15, Sharron told Walker he was being laid off. ECF No. 1-2 at 3.  According to Walker, during his termination meeting, Marty stated that Apex

---

[3] Marty also testified the layoff was due to reduced hours throughout the prior fall, so instead of continuing to reduce everyone's hours, Apex decided to lay off one employee. ECF No. 29-1 at 94-95, 264.

"didn't want the Union in, but of course that didn't happen." *Id.* at 48.[4]  Walker avers that Marty said that the union had nothing to do with why Walker's position was being eliminated and that Walker was subject to rehire. *Id.*  Neither Valdovimos Magana nor Porter was laid off, even though they also worked a graveyard shift. ECF No. 29-1 at 92, 579-80.  Walker was laid off because he was the last one hired. *Id.* at 92.

After the layoff, Marty approached the union about hiring additional engineers. *Id.* at 95. Ed asked Apex to rehire Walker, but Apex responded that Walker was not qualified to be a full engineer and Apex was not hiring utility engineers. ECF Nos. 1-1 at 122-23; 29-1 at 96-97.  On October 25, Apex advised the union it intended to hire a utility engineer. ECF No. 1-2 at 82.  Ed suggested Apex rehire Walker. *Id.*  Apex hired two utility engineers, but not Walker. *Id.*  Marty explained that Apex did not rehire Walker because the union wanted Walker rehired at his former hourly rate of $25 per hour, but the new engineers would be hired at $15 per hour. ECF No. 29-1 at 210.

Overstreet has presented some evidence in support of this charge.  Walker was a suspected union supporter who openly engaged in union support activity by observing the election.  As already discussed, there is evidence of anti-union sentiment, and Walker avers that Marty made reference to the union during Walker's layoff meeting.

Although Apex relies on a business need for the layoff, Apex has never provided the union with documentation showing that need. ECF No. 29-1 at 426-27.  Additionally, although Marty said the graveyard shift was no longer necessary, he laid off only Walker and not the other two employees on the graveyard shift who had been identified for layoff.  Given the reference to the union during the layoff meeting, Walker's suspected and known union support, the proximity between the election and his layoff, and the later refusal to rehire Walker, Overstreet has met his burden of producing some evidence and an arguable legal theory in support of this charge.

/ / / /

---

[4] Marty denied he mentioned the union during this meeting. ECF No. 29-1 at 588.  However, conflicting evidence does not necessarily preclude a finding that Overstreet has shown a likelihood of success on the merits.

### 3. *Servin*

Overstreet has presented some evidence that Servin was discharged for participation in union activities. Servin supported the union by wearing union buttons and putting a union sticker on his phone and toolbox. Overstreet has presented evidence Apex was aware of his conduct because he publicly displayed his union support and because Servin was identified as a union negotiator before he was fired. ECF Nos. 1-2 at 52; 29-1 at 538. As already discussed, there is evidence of anti-union sentiment.

Apex contends it fired Servin for legitimate reasons because Servin had numerous unexcused absences and he lied about the reasons for those absences. Additionally, Apex argues it had video surveillance showing Servin distributing union materials during work hours, which violates Apex's non-solicitation policy.

There is some evidence these reasons were pretextual. After Servin explained his absence related to his daughter going into false labor, he was not further counseled or disciplined on the matter. ECF No. 29-1 at 550. Additionally, Servin was disciplined for his absences April 27 through May 2 even though he produced a doctor's note in support and was not told that his calling off work was improper. *Id.* at 552. Servin disputes that there was any change in his work performance and that any slowdown was due to understaffing after Apex fired Arellano and laid off Walker. *Id.* at 539-43. Finally, Servin states he has seen other employees regularly solicit in relation to non-union matters but those employees were not disciplined. ECF No. 1-2 at 73; *see also* ECF No. 29-1 at 336-37 (another employee testifying that candy bar sales occurred during work hours whenever someone came to the secretary's desk to buy some); *id.* at 520 (Arellano testifying he has seen other employees sell items at work). Although Marty claimed he did not know other employees were soliciting at work, he was aware that his secretary sold candy for fundraisers. ECF No. 29-1 at 116-18. Additionally, Keith Marsh, director of engineering, testified that if Servin had been handing out something other than union materials, he likely would not have been disciplined. *Id.* at 336.

////

In sum, Overstreet has presented some evidence that Servin was discharged in retaliation for his union support given the disparity in treatment, the proximity in timing from the union vote in February, Arellano's termination in February, Walker's layoff in March, and then Servin's attempted discharge in April[5] and completed termination in May. These three were main union supporters and all were terminated within three months of the union vote.

**C. Section 8(a)(5)**

Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." Section 159(a) provides that the selected representative "shall be the exclusive representative[] of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." Overstreet alleges three violations under this section: (1) Apex did not provide information that is relevant and necessary to the union's duties as the bargaining representative, (2) Apex instituted changes in employees' terms and conditions of employment without first bargaining (changing the lunchroom, changing schedules, and using third parties to do the engineers' work), and (3) Apex failed to bargain in good faith by not making proposals or counterproposals and failed to provide a representative with authority to enter into agreements on Apex's behalf.

*1. Providing Information*

Overstreet has narrowed this claim to the failure to provide the following categories of information: (1) a list of current bargaining unit employees including their date of completion of any probationary period; (2) copies of all manuals, training materials, policies, and procedures currently in use and a copy of Arellano's training records; (3) a list of employees who have had schedule changes, including dates and job classifications at the time of the changes; (4) copies of Arellano's employee evaluations and all evidence used in the decision to terminate Arellano; and

---

[5] Marty decided to terminate Servin after he observed Servin taking pictures in the plant. That decision was rescinded after Servin explained he was taking photographs of a thermometer showing how hot some laundered sheets were, and he showed Marty and Dramise that he sent the photograph to another engineer at Apex. ECF Nos. 1-2 at 52-53; 29-1 at 103-07.

(5) information related to what was behind the layoff and change in employees' schedules, evidence of the business need that required these actions, and copies of subcontractor AJ Industries' invoices for the past five years.  Overstreet provides a viable legal theory for these alleged unfair practices because "[a]s part of its duty to bargain in good faith, an employer must provide the union with information that is relevant and necessary to bargaining." *HTH Corp.*, 693 F.3d at 1064 (giving the example that if the "employer justifies its bargaining position during negotiations on an inability to pay, this entitles the union to request financial documents sufficient to substantiate the employer's position").

### a.  Current bargaining unit employees' probationary period

The union requested this material in February 2017. ECF No. 29-4 at 4.  At the ALJ proceeding, Marty testified that Apex does not have records showing when each engineer passed probation. ECF No. 29-1 at 149.  Apex never informed the union that it does not have records showing that information. *Id.* at 149-50.  The union is now aware of this fact. *Id.* at 418, 421.  It is unclear what injunctive relief Overstreet seeks in relation to this allegation because apparently there are no records to produce.  I therefore do not address this allegation.

### b.  Policies and procedures and Arellano's training records

The union requested this material in February 2017. ECF Nos. 29-3 at 8; 29-4 at 4.  Marty responded that the training and equipment manuals are too voluminous to provide copies and he provided only the employee handbook. ECF No. 29-4 at 8.  Apex never offered alternative means to view these materials. ECF No. 29-1 at 150.  According to Marty, the union did not ask for alternative means to view the materials, although he admitted the union requested access to the facility and Apex denied that request. *Id.*  It is unclear from the record whether this request was directed at viewing these materials or was for another purpose.  Apex has not provided copies of sign off sheets for equipment training and it has not provided the company's health insurance plans. *Id.* at 151-52, 421-22.

As for Arellano's training records, Apex did not provide any training records to the union. *Id.* at 156, 220-21.  Marty testified he did not produce training records because he believed they

did not exist. *Id.*  Marty testified he since has found out that Apex does have training records, although he is unsure the extent of those records. *Id.*  Marty did not tell Ed that records do exist because the union never raised the topic of training records again after its initial request in February. *Id.* at 157-58, 223.

Overstreet has presented some evidence that the union requested these materials, Apex did not provide them, and Apex did not provide alternative means to view the materials, including denying a union request to visit the facility.  The fact that the union did not repeat some of its requests does not absolve Apex of its responsibility to provide the information. *See Aero-Motive Mfg. Co.*, 195 NLRB 790, 792 (1972) ("If the Union was entitled to the information at the time it made the request, then Respondent was obligated to furnish it and there is no obligation of the Union to repeat such a request any given number of times.").  These records are relevant to the union's bargaining responsibilities. ECF No. 29-1 at 422-23.  Overstreet therefore has shown a likelihood of success on this charge.

<u>c.  Schedule change information</u>

The union requested this material in February 2017. ECF No. 29-4 at 6.  Apex responded by providing employee time cards because Apex did not specifically keep records regarding schedule changes. ECF No. 29-1 at 178, 421.  Ed was not able to determine schedule changes from the timecards. *Id.* at 274, 421.  It is unclear what injunctive relief Overstreet seeks in relation to this allegation because apparently there are no records to produce that would show schedule changes.  I therefore do not address this charge.

<u>d.  Arellano's evaluations and evidence used in termination decision</u>

In February 2017, the union requested Hernandez's statement, Arellano's evaluations, and copies of all evidence, such as video and audio recordings, used in the termination decision. ECF No. 29-3 at 4, 8.  Apex did not provide Hernandez's statement. ECF No. 29-1 at 420.  Instead, Ed obtained a copy from Arellano. *Id.*  Apex also did not provide the video surveillance of Arellano and Hernandez talking. *Id.* at 420.  Overstreet therefore has presented some evidence that the union requested this information and Apex did not provide it.  This information is relevant to the

union's ability to negotiate over Arellano's termination. *Id.* at 425-26. Overstreet thus has shown a likelihood of success on the merits of this charge.

<u>e. Information related to the layoff and schedule change/AJ invoices</u>

The union requested this information in February 2017. ECF No. 29-3 at 5, 7. Apex did not provide any information in response. ECF No. 29-1 at 426-27. This information was relevant to the union's ability to evaluate Apex's decision to lay off Walker, change the other employees' schedules, and to allegedly use AJ Industries employees instead. *Id.* at 425-27. Overstreet thus has shown a likelihood of success on the merits of this charge.

### 2. *Instituting Changes*

Overstreet has presented viable legal theories for these alleged unfair practices because the employer cannot bypass the union and deal directly with employees on terms and conditions of employment. *See N.L.R.B. v. Katz*, 369 U.S. 736, 743 (1962). Additionally, "[s]ection 8(a)(5) requires employers to refrain from making a change in mandatory bargaining subjects unless the change is preceded by notice to the union and the opportunity for bargaining regarding the planned change." *Raytheon Network Centric Sys.*, 365 NLRB No. 161, 2017 WL 6507215 (Dec. 15, 2017) (emphasis omitted).

### a. Schedule Changes

Apex does not dispute that it made schedule changes without consulting with the union. *See* ECF No. 29-1 at 176-83, 242, 249-50, 432-34. However, Apex contends that it is merely following its status quo policy of approving schedule changes on an ad hoc basis when employees request it, which it is allowed to do under *Raytheon* because that does not constitute a change in a mandatory subject of bargaining. There was testimony at the ALJ proceeding that Apex's past practice has been to let engineers work out schedule changes amongst themselves and then request Sharron and Marty approve those changes. *Id.* at 242, 249-250.

An employer does not violate Section 8(a)(5) if its unilateral action does not change existing conditions. *Raytheon*, 2017 WL 6507215, at *7. "An established past practice can become part of the status quo." *Id.* (quotation omitted). Thus, an employer does not engage in an

unfair practice by "simply follow[ing] a well-established past practice." *Id.* (quotation omitted).
To determine whether the employer has made a unilateral change or instead is following a past practice, the inquiry is whether the employer made "a substantial departure from past practice" that "materially varied in kind or degree from what had been customary in the past." *Id.* at *8-9 (quotations omitted). Thus, "regardless of the circumstances under which a past practice developed--i.e., whether or not the past practice developed under a collective-bargaining agreement containing a management-rights clause authorizing unilateral employer action--an employer's past practice constitutes a term and condition of employment that permits the employer to take actions unilaterally that do not materially vary in kind or degree from what has been customary in the past." *Id.* at *21.

Overstreet has not shown a likelihood of success on the merits of this allegation to the extent it rests on the consensual schedule swaps between employees. The evidence shows these changes followed the employer's past practice of allowing its engineers to adjust their schedules amongst themselves, subject to approval by Sharron and Marty. Thus, Apex did not change the status quo by approving the schedule changes.

However, this theory does not apply to Apex's unilateral change of all engineers' schedules in conjunction with Walker's layoff. That change did not come about as a result of past practice of the employees negotiating schedule changes amongst themselves. Instead, it was a new schedule imposed by Apex on all engineers. Overstreet has shown a likelihood of success on the merits of this claim because Apex imposed the new schedule and layoff without providing information to the union showing the business need for these actions and without first bargaining over the changes.

### b.  AJ Industries

AJ Industries is a subcontractor owned by Dramise that does laundry equipment service and installation at Apex (and for other businesses). ECF No. 29-1 at 185. AJ employees perform installation, service, and maintenance work at Apex. *Id.* Apex typically uses AJ employees for
/ / / /

capital projects, installation, and special projects. *Id.* at 186.  AJ employees also occasionally perform overflow work when Apex engineers are too busy. *Id.* at 277-78.

Servin avers that after Arellano and Walker were terminated, he saw AJ employees working in the plant more often than before. ECF No. 1-2 at 56.  Although Servin admitted that Apex regularly would use AJ employees when it was busy at the plant, he testified that after Arellano was fired, Apex brought in an AJ employee to cover Arellano's shift for a week. ECF No. 29-1 at 566.  Servin testified this was a different use of AJ employees because they had not covered an entire shift before. *Id.* at 567.

AJ Industries' invoices dated the week after Arellano was fired show AJ employees did work that Apex engineers normally would perform, including cleaning up the shop and fixing a leak on a dryer. *Id.* at 276-78, 399-400; ECF No. 29-11 at 10.  Other invoices mentioned miscellaneous work that same week. ECF No. 29-11 at 12-13.  Marty characterized that work as overflow, which, as Servin testified, was consistent with past practice of using AJ employees when it was busy. ECF No. 29-1 at 277.

Overstreet has shown a likelihood of success on this claim, although it is not a strong showing.  The evidence shows the employer's past practice was to use AJ employees to perform overflow work, meaning AJ employees would perform work normally performed by bargaining unit employees when it was busy at the plant.  However, Servin's testimony is some evidence that Apex used AJ employees in a way that varied in kind and degree from past practice because an AJ employee covered an engineer's entire shift.  AJ's invoices from the week following Arellano's termination show AJ charged for many hours for work bargaining unit employees normally would perform or that was described as "miscellaneous."  Additionally, Apex did not provide the union with AJ's invoices despite the union's request for that information.  A reasonable inference from Apex's conduct is that it did not want the union to see it used AJ employees to perform bargaining unit work.

////

////

### c. Break Room

Overstreet has shown a likelihood of success on this charge, but it is not a strong showing. There was testimony that the engineers used a particular room known as the parts room as an unofficial break room. *Id.* at 172. According to Marty, Apex had planned to turn the room into a parts room and require all employees to use the newly renovated official break room before Apex even knew about a union organizing effort. *Id.* at 162, 165. Marty also testified this plan was communicated to engineers at a January 11th meeting. *Id.* at 237; *see also* ECF No. 30-2 at 112 (notes from January 11th meeting stating "lunch room – remove"). Dramise likewise testified that the engineers were told about the planned conversion to a parts room before the union came in. ECF No. 29-1 at 329-60.

Although the official break room was finished in December 2016, Marty testified the parts room was not closed as a break room until early February because Apex did not have the shelving to convert it into a parts room, so it had no need to use the room until then. *Id.* at 171-72. Marty testified Apex eliminated other small break rooms around this same time, but when Ed visited the facility he was shown a break room used by dry cleaning employees. *Id.* at 173-74, 430. Arellano testified the break room was closed the day after the union election, and he had no prior notice of a plan to convert it to a parts room. *Id.* at 518; *see also id.* at 171, 560 (Servin testifying that the day after election, the table and chairs in the room, which belonged to Dramise, were removed and a message was left on a white board to use the main break room). Overstreet thus has presented some evidence that Apex made the decision to convert the break room into a parts room only after the union election.

### 3. *Refusing to Bargain in Good Faith*

Overstreet identifies two unfair practices under this category: (1) failing to bargain in good faith by not making proposals or counterproposals and (2) failing to provide a representative with authority to enter into agreements on Apex's behalf. Overstreet has presented evidence and a viable legal theory in support of the allegation that Apex did not make proposals and counterproposals. Although the NLRA does not require the parties to reach an agreement, the

parties must "participate actively in the deliberations so as to indicate a present intention to find a basis for agreement, and a sincere effort must be made to reach a common ground." *N.L.R.B. v. Montgomery Ward & Co.*, 133 F.2d 676, 686 (9th Cir. 1943). Merely attending bargaining sessions "with a completely closed mind and without this spirit of co-operation and good faith is not a fulfillment of this duty." *Id.* "While the Act places upon the employees the burden of instituting the bargaining proceedings and no burden in this respect upon the employer, it is not incumbent upon the employees continually to present new contracts until ultimately one meets the approval of the company." *Id.* at 687.

The union presented a proposal to Marty on April 27. ECF No. 1-2 at 86. Some sections of the proposal were incomplete because, according to Ed, the union had not received certain information from Apex, such as wage rates and health insurance, to fill those sections out. *Id.* Ed met with Marty and started to go over the proposal section by section. *Id.* Marty stated it was taking too long and he could not discuss the contract until there was a complete proposal. *Id.* He also requested an electronic version of the proposal. *Id.* Ed sent him a PDF version shortly thereafter. *Id.*

On May 23, Ed delivered a physical copy of a proposal including the economic package numbers that were left blank the last time (except for some sections where Apex had not provided information to the union, such as benefits plan information). *Id.* Ed requested written counterproposals. *Id.* Marty requested a Word version of the document so he could do a redline response. *Id.* at 87. Ed refused, saying he had already provided it in PDF format. *Id.*

Ed and Marty met again on July 11. *Id.* at 87. Ed asked if Marty had any proposals on the agreement. *Id.* Marty said he did not because Ed had not sent a Word version. *Id.* When Ed said he was not going to send a Word version, Marty indicated he would get it typed up and get back to the union. *Id.*

The parties met on July 18. According to Ed, Marty went through the union's proposals stating he disagreed, disagreed with part, or could never agree to the union's proposals, but offered no counterproposals. *Id.* at 109. Ed asked if they could tentatively agree on those parts

1  that Marty did agree with and set those parts aside so they could focus on the disagreements. *Id.*

2  at 109-110.  According to Ed, Marty said he did not have authority to agree to anything himself

3  and that he had to take it back to Apex's board for approval. *Id.*

4       They met again on July 25 and Ed asked Marty if he had any counterproposals or whether

5  he was willing to tentatively agree to any proposals. ECF No. 1-2 at 109-10.  Marty stated he

6  could negotiate but he would have to take it to Apex's board to approve. *Id.*  Marty refused to

7  agree to various proposals and made no counterproposals. *Id.*  Marty provided a written document

8  to the union on July 26. ECF Nos. 29-1 at 199; 29-11 at 1-6.  In that document, Marty identified

9  sections of the union's proposal that Apex could not agree to and that were "not acceptable." ECF

10 No. 29-11 at 1-6.  Most of the items identified were rejected outright as unacceptable, with no

11 counterproposal. *Id.*

12      They met again on September 8 and Ed asked if Apex had counterproposals. ECF No. 1-2

13 at 81, 85-86.  Marty responded that Apex had turned negotiations over to its lawyers and they

14 would get back to the union. *Id.*  As of November 14, Apex had not made any counterproposals to

15 the union. *Id.* at 82-83.  Apex finally offered a counterproposal on December 1. ECF No. 11-5 at

16 174-95.

17      Overstreet has presented some evidence of a lack of good faith bargaining on Apex's part.

18 Apex's reliance on the fact that Ed would not provide a Word version of the union's proposal as

19 the reason Apex did not offer counterproposals is unconvincing.  While Ed's refusal is

20 perplexing, once Apex knew that was Ed's position, it should have promptly either retyped the

21 document, converted the PDF version into Word, or simply made physical redlines on a hard

22 copy.  There is no explanation for why that would take months to accomplish.  Although Marty

23 met with Ed many times, at none of these meetings did Marty agree to any terms or offer

24 counterproposals.  Instead, he stated that the company would not agree to union proposals without

25 suggesting alternatives.  Nor would he tentatively agree to those portions where there was no

26 disagreement.  While the Act does not require Apex to agree to the union's terms, it requires more

27

28

than meeting with the union with a closed mind, unwilling to do anything but decline the union's proposals.

However, Overstreet has not shown a likelihood of success on the allegation that Apex did not provide a negotiator with authority to bargain. "The duty to bargain includes the obligation to appoint a negotiator with real authority to negotiate and carry on meaningful bargaining regarding fundamental issues." *Wycoff Steel*, 303 NLRB 517, 525 (1991). "[A]n employer is not required to be represented by an individual possessing final authority to enter into an agreement," so long as that "does not act to inhibit the progress of negotiations." *Id.* "The degree of authority possessed by the negotiator is a factor which may be considered in determining good-faith bargaining." *Id.*

Marty is an owner and chief operating officer of Apex. ECF No. 11-2 at 1. He was the appointed negotiator and the union continued to negotiate with him even after he told the union that he would have to get final approval from Apex's board. He also relayed Apex's December 1 counterproposal, thus suggesting he has authority to communicate on Apex's behalf regarding bargaining. Both Marty and Dramise testified Marty has authority to bargain. ECF No. 29-1 at 205-06, 358. Overstreet therefore has not shown a likelihood of success on this charge.

## II. Irreparable Harm

A preliminary injunction may not be entered "based only on a possibility of irreparable harm." *Operative Plasterers' and Cement Masons' Int'l Ass'n*, 611 F.3d at 490-91. Instead, the party seeking relief must show irreparable harm is likely in the absence of preliminary relief. *Id.* "[P]ermit[ing an] allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Avanti Health Sys., LLC*, 661 F.3d at 1191 (quotation omitted). Additionally, "[f]ailure to bargain in good faith[ ] has long been understood as likely causing an irreparable injury to union representation." *HTH Corp.*, 650 F.3d at 1362.

By refusing to negotiate in good faith, Apex has successfully thwarted any union agreement for nearly a year, thus undermining the union's effectiveness and denying the employees their right to bargain collectively. This is a recognized irreparable harm. By failing to

provide requested information, Apex also has undermined the union's ability to effectively negotiate on subjects of mandatory bargaining.

Further, Overstreet has presented evidence of a likelihood of irreparable harm related to the termination of Arellano, Walker, and Servin. Within three months of the union vote, Apex ousted three of the top union organizers. According to Ed, after Servin was fired no employee would agree to serve on the negotiation committee for the union. ECF No. 1-2 at 113-14. Ed also avers that one employee stated he did not want to lose his job and he was done with the union, while another stated this was not what he signed up for and asked what the employees could do to stop it. *Id.* at 114. Although these are hearsay statements, I may consider hearsay at the injunctive relief stage. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). Given that this is the first time these employees have been represented by a union at Apex, the union's perceived ineffectiveness in remedying actions taken against bargaining unit members would erode confidence even more than an established union.

**III. Balance of the Hardships**

Apex is already compelled by law to bargain in good faith and to provide relevant information the union requests, so an injunction requiring it to do so would not burden it. A mandate to offer to rehire Arellano, Walker, and Servin may impose some burden on Apex although Apex does not present evidence that it could not afford to rehire them. Additionally, "to the extent [Apex] has hired new workers, the rights of the employees who were discriminatorily discharged are superior to the rights of those whom the employer hired to take their places." *Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994). The harm to the union and the discharged employees outweighs the harm to Apex.

**IV. Public Interest**

Because Overstreet has shown a likelihood of success, the public interest favors injunctive relief to support the public policies underlying the NLRA and to fulfill § 10(j)'s purpose, which is

to prevent an unfair labor practice from being successful due to the delay in the Board's adjudication of unfair practice charges.

## V. Unclean Hands and Delay

I have considered Apex's argument that I should deny injunctive relief because the union has also engaged in bad faith bargaining tactics, and the union's unclean hands should be imputed to Overstreet because he seeks relief on the union's behalf. The Act gives authority to the Board to seek injunctive relief, and "the underlying purpose of Section 10(j) is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 957 (9th Cir. 2010) (quotation omitted). Consequently, the Board has its own interests, independent of the union, that it seeks to vindicate through the requested injunctive relief. I therefore do not impute the union's alleged unclean hands to Overstreet.

I have also considered Apex's argument that Overstreet unduly delayed seeking injunctive relief. Delay is a factor to consider in determining whether and what relief is just and appropriate. But "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo*, 853 F.2d at 750. The Board "needs a reasonable period of time to investigate and deliberate before it decides to bring a section 10(j) action." *Id.* Consequently, delay is significant only "if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Id.* That is not the case here.

## VI. Relief

Overstreet has shown a likelihood of success on the merits, a likelihood of irreparable injury, and that the balance of hardships and the public interest favor injunctive relief. I therefore consider what relief is just and proper under the circumstances. 29 U.S.C. § 160(j).

An injunction may be prohibitory or mandatory. A "prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79

(9th Cir. 2009) (quotation omitted). In contrast, a "mandatory injunction orders a responsible party to take action." *Id.* (quotation omitted). "A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Id.* (quotation omitted). Generally, a court should not grant a mandatory injunction "unless extreme or very serious damage will result." *Id.* (quotation omitted). A mandatory injunction is "not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (quotation omitted).

Overstreet requests both prohibitory and mandatory relief. I deny Overstreet's request that I enjoin Apex from informing employees it would be futile to select the union as their representative and threatening reprisals if they select the union. The employees have already voted and selected the union. This requested relief is therefore moot.

I grant Overstreet's requested relief that Apex be enjoined from: (1) interrogating employees about their union activities, (2) creating the impression that employees' union activities are being surveilled, (3) discriminating against employees because of union support, (4) making changes in the terms and conditions of employment without notice to or bargaining with the union where that change varies in kind or degree from Apex's past practices, (5) failing to give the union requested information that is necessary to the union's representation of the unit, and (6) failing to bargain in good faith. These requests are supported by the evidence and require only that Apex do what it is already obligated to do.

I also grant a mandatory injunction requiring Apex to: (1) offer to re-hire Arellano, Walker, and Servin, (2) bargain in good faith with the union by meeting and negotiating in good faith, and (3) provide to the union requested information. Apex is already obligated to bargain in good faith and to provide relevant requested information. As for the discharged employees, ordering an offer to re-hire is necessary to remedy the irreparable harm to this newly certified union, particularly considering that a final Board decision may be months, if not years, away. Even if the employees already have other jobs, an order requiring Apex to offer re-hire will signal

to other employees that Apex cannot effectively get away with retaliatory discharges due to the length of time it takes for the Board to resolve unfair labor practice charges.

Additionally, I grant a mandatory injunction requiring Apex to (1) post copies of this order at the workplace and allow the NLRB access to the workplace to monitor that this has been done, (2) hold a mandatory meeting at which portions of the court's order (as set forth below) will be read aloud to bargaining unit employees, and (3) submit an affidavit saying these things have been done. The Ninth Circuit has approved the remedy of a mandatory meeting to read a Board order to employees. *United Nurses Ass'ns of Cal.*, 871 F.3d at 788-89. The Ninth Circuit rejected the argument that a reading was "an extraordinary remedy." *Id.* Rather, the court characterized it as "an effective but moderate way to let in a warming wind of information and, more important, reassurance." *Id.* (quotation omitted). In *United Nurses*, the Ninth Circuit concluded a reading order "was clearly warranted in light of [the employer's] several unfair labor practices, including its retaliatory firing of a prominent Union supporter." *Id.* Thus, although a reading order is in a sense mandatory injunctive relief, it is not particularly burdensome and is meant to remedy the harm caused by the unfair labor practices in undermining employee confidence in the union.

I deny Overstreet's request that Apex purge the discharged employees' files. Such interim relief is unnecessary. The Board will resolve whether the employees were discharged in retaliation for their union activities or were properly discharged for misconduct or as part of a valid layoff. Purging the files now is premature, especially if the Board finds the discharges were justified. Additionally, I deny the request to reopen the break room. Given the relatively weak showing on the merits on this charge and the availability of a newly renovated break room, I do not find interim injunctive relief just and proper under the circumstances.

Finally, I deny the requested relief regarding AJ Industries. Even if Apex used AJ employees inappropriately, and thus engaged in an unfair labor practice, the evidence was limited to a single week in February just after Arellano was terminated. There is no evidence Apex continued, or will continue in the future, to use AJ employees to perform bargaining unit work beyond its past practice of using AJ for overflow work.

## V. Conclusion

IT IS THEREFORE ORDERED that petitioner Cornele Overstreet's petition for temporary injunction **(ECF No. 1) is GRANTED in part**.

IT IS FURTHER ORDERED that, pending the underlying administrative proceedings before the Board, respondent Apex Linen Service, Inc. is hereby **RESTRAINED AND ENJOINED** from:

1. Interrogating employees about their union support and activities;

2. Creating the impression among employees that their union activities are under surveillance;

3. Discriminating against its employees in regard to hire or tenure of employment or any term or condition of employment, by conduct including but not limited to discharging its employees because its employees engaged in activities in support of the union, and in order to discourage membership in the union or in any other labor organization;

4. Making changes in the terms and conditions of employment of employees in the following appropriate collective-bargaining unit (the Unit) without notice to or bargaining with the Union as the collective-bargaining representative of the Unit:

> All full-time, regular part-time, and extra board Engineers and Utility Engineers employed by the Employer at its facility located in Las Vegas, Nevada; excluding, all other employees, office clerical employees, guards, and supervisors as defined in the Act.

5. Failing and refusing to provide information requested by the union that is necessary for and relevant to the Union's representation of the Unit; and

6. Failing and refusing to bargain in good faith with the union as the representative of the Unit, including by refusing to make proposals and counter-proposals in collective-bargaining negotiations.

IT IS FURTHER ORDERED that respondent Apex Linen Service Inc. shall:

A. Within ten (10) days of this Order, offer Adam Arellano, Charles Walker, and Joseph Servin, in writing, immediate reinstatement to their former jobs, or if those jobs no longer

exist, to substantially equivalent positions of employment, without prejudice to their seniority and other rights and privileges previously enjoyed, displacing if necessary any workers hired or transferred to replace them.

     B.     Within fifteen (15) days of this Order, provide to the union the categories of information identified in this order that remain outstanding, or to make good faith efforts at reaching a mutually agreeable date, time, and location for the union to view such materials if they are too voluminous to provide copies.

     C.     Within fifteen (15) days of this Order, post copies of this Order, as well as translations of this Order provided by the Regional Director of the Board in English and Spanish, at Respondent's facility located at 6375 South Arville Street, Las Vegas, Nevada, in all places where notices to its employees are normally posted; maintain these postings during the pendency of the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement.

     D.     Within twenty (20) days of the Court's issuance of this Order, hold a mandatory meeting or meetings during working time at Respondent's facility located at 6375 South Arville Street, Las Vegas, Nevada, at which the following portions of this Order are to be read aloud: page 1 line 1 through page 3 line 4; page 24 lines 21 – 24; page 27 line 1 through the end of the Order. Those portions are to be read aloud by a responsible management official in the presence of an agent of the Board, or at Respondent's option by an agent of the Board in that official's presence, in English and Spanish. It shall be read aloud to all employees in the identified bargaining unit employed at Respondent's facility located at 6375 South Arville Street, Las Vegas, Nevada, including at multiple meetings as necessary to ensure that the Order is read aloud to all bargaining unit employees.[6] The employees also shall be told that the court's findings are set out in full in this Order, which they can read in the posted copies.

---

[6] If the employees in the identified bargaining unit work on different shifts, Apex shall hold a sufficient number of meetings to accommodate those different schedules.

E.      Within thirty (30) days of this Order, file with the Court, and submit a copy to the Regional Director for Region 28 of the Board, a sworn affidavit from a responsible agent of Respondent stating, with specificity, the manner in which Respondent has complied with the above terms of the Injunction Order.  And,

F.      Within fifteen (15) days of receiving the union's response to Apex's December 1st counterproposal,[7] respond in writing to the union, with a copy to Petitioner, with details as to what Apex agrees to, what it does not, why, and with reasonable proposed alternatives where there is disagreement.  This process shall repeat upon the union presenting a written counter-offer to Apex.  The union and Apex may jointly agree to extend the fifteen-day deadline at any time if they agree no report is necessary at any particular point in the negotiations (i.e., the negotiations are progressing such that a report is unnecessary).  If the union requests a face-to-face bargaining session, Apex must attend and negotiate in good faith to either reach agreement or bargain to good faith impasse.  If Apex refuses to attend or continue a face-to-face bargaining session, it must submit a report to Petitioner within fifteen days of that action explaining why it ceased participating.

DATED this 12th day of February, 2018.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

---

[7] According to Marty's affidavit attached to Apex's supplemental brief, the union has not responded to Apex's December 1 counterproposal. ECF No. 30-1 at 3.  If the union believes it has responded, it should re-send its response, with a copy to Petitioner.  Apex's obligations under paragraph F of this temporary injunction are not triggered until the union responds to Apex's December 1 counterproposal.